Thank you. Please be seated. Judge Livingston is not sitting with us on this case. She will join us for the rest of the calendar at the conclusion of this argument. We'll hear first from the appellant. Thank you. Thank you, Your Honors. Daniel Kaiser, representing the plaintiff appellant, Ms. Dhaliwal, in this appeal. There were two principal legal errors, respectfully, that plaintiff appellant believes the district court made in deciding to dismiss her case on summary judgment. The first relates to whether Ms. Dhaliwal, while she was employed by the defendant, engaged in protected conduct, which would, of course, be the necessary prerequisite for her to be able to state and ultimately demonstrate a retaliation claim. And Salix had to know that she was engaging in protected conduct in order to retaliate, correct? That's correct, Your Honor. All right. Continue. And so the mistake was both legal and factual. In terms of the factual mistake that was made by the court, it was in the court's description of what exactly Ms. Dhaliwal complained about. And she complained about a series of different things. Most important, she objected to what is generally described in the industry and related to the regulatory regimen that is relevant to this issue, the dock-in-the-box program. And that is the basis of the settlement that Salix made with the government, was the dock-in-the-box program, wasn't it? It was in part, Your Honor, the basis of that settlement, yes. So there were a number of different violations. And I wasn't representing Ms. Dhaliwal for that portion of the case, but my understanding is the dock-in-the-box violation was an aspect of the settlement. And that was the U.S. Attorney prosecuting that matter, and it was something like a $54 million settlement with Salix on those charges. But Ms. Dhaliwal, when she was there, and the only part of this that remains is her personal retaliation claim as to whether she was punished as a result of her complaints, yes, she expressly objected to the dock-in-the-box program to one of her supervisors. She attended an event that this was going on, and there was, without getting into the details, because it's not important for this argument, but there was a little computer with the speaker so that there could be the cover for the providing of the lavishing of the gratuities on the attendees, mostly doctors, and she complained. And she said that it needed to be brought to compliance, and her supervisor said, no, you don't go. Don't you go to compliance. I'll take care of it. And as far as her understanding is, she didn't. So, I mean, he didn't. So that was one of the things that she complained about that clearly would constitute protective conduct, separate and apart from then obviously having to connect it up to the adverse employment actions, which I believe is the second error that was made here, certainly in terms of there being jury trials for consideration. But she also complained about marketing material that was being used, fraudulent omissions in those materials, about efficacy data, health outcome data. She expressly complained about these things. And in fact, the record evidence really doesn't include denials of those things, meaning that she never complained about these things. The defense is essentially that they didn't constitute protective conduct. But in fact, that it does. Did any of the other things she complained about relate to fraud on the government? Yes, Your Honor. For example, when you can't obviously, when you're marketing material for drugs that ultimately are being billed to the Medicare and Medicaid programs, you can't lie about those drugs, or you can't mislead about those drugs. And you can't fraudulently omit information about those drugs. So, for example, health care outcome data, efficacy data, safety data generally. These are things in the industry that... Were they omitted or were they false? Well, they didn't exist. And so what Ms. Dollywell said to her supervisors, you cannot market these materials. Because the assumption in the industry will be that these studies are done, and that they exist. And they didn't exist. So that was in her judgment of fraudulently omission. You had to be clear to them that these kinds of studies simply were absent. And you couldn't go and market material about a drug where people would assume the existence of them and they didn't exist. But there were also, Your Honor... But you think Judge Coates didn't think that it was apparent from the nature of the complaints your client alleged, that her concern was fraud on the government as opposed to something else. I mean, there are a whole number of entities and people who are affected by these notices, by these payments. And her concern was in nothing that your client ever submitted or said did she suggest that this would be a fraud on the government. And that's the protected activity. So help us out with what you think is the error. And I think, Your Honor, that gets to, circles back to what I originally said, which was not only was there a factual mistake in how, what she was complaining about presented in the decision, but a legal error in what the standard was in terms of what you need to say in order for it to be protected conduct. And what the judge suggested, as does the defendant, is that you need to be communicating to your employer, if this is an internal complaint, that there was, this could be fraud, that this could lead to fraud, that this could lead to fraud on the government. And that isn't the standard as articulated by this circuit, for example, in Chorchus, or by other decisions such as Alajon, which is a well-known now Southern District decision about what you need to say to be protected conduct. You don't have to say this could be fraud. You need to be complaining about, factually, about conduct that could lead, may lead to an FCA action. It was very overt with the dock in the box. And the dock in the box is very overt, yeah. You said it should go to legal compliance. That's correct. So the dock in the box, I think, if there's any close, closer question about things that she complained about, it would, it would not include dock in the box. I mean, dock in the box was, I mean, she was as overt as you could be in saying, this is a, you know, this is, you can't do this. This needs to go to compliance. And in fact, the proof is in the pudding with dock in the box, because it actually became, it did lead to an FCA action. The U.S. attorney actually pursued that to, to extract a fine from the company on the dock in the box. But I do think, Your Honor, that it also applies to her complaining about marketing materials, because, you know, not, you know, it's one of the bedrock principles, particularly in the Medicare Medicaid program, that you've got to be truthful with, with, with the, with the consumers of these potential consumers of these drugs, which include the government. And that includes not omitting material that everyone believes should be there. Was this claim part of the settlement after the government came into the case? You know, I, I don't know, Your Honor, I know the dock in the box was, but again, I wasn't part of that. So I, I just, I don't know. I don't, I don't know. In the few minutes remaining, why don't you speak about retaliation? What was the nature of the retaliation? Well, she, you know, there were, there was really three distinct acts of retaliation, Your Honor. There was a failure to promote. She was promised a promotion and didn't get it, that she was actually demoted. Wasn't she out sick during this period? No, no. This was prior to her taking FMLA leave, that there was a promotion promise she didn't get. And this followed very closely in time to the complaints that she was making. She didn't get her full bonus. And also, ultimately, and this is a contested fact as to whether she was terminated, the, the CEO within a week of her reiterating the complaints to the CEO of the company, the dock in the box program, all of it, she was told that we don't want you here anymore, that, you know, you shouldn't come back to work here. And we, we contend that that was. You're arguing a construct, constructive firing? Well, at a minimum, Your Honor, when the CEO of the company says, don't come back to work here and we don't want you here, that would be at a minimum constructive termination. I think you could make an argument that that is in fact, you know, at that level of coming down to an actual termination, but that's separate from the failure to promote compensation issues which occurred before. And I would just say one thing. In addition, there was direct evidence of retaliation. I mean, she was told on two occasions to shut her mouth about these issues when she brought them out by her supervisor, which would corroborate the very close timing. He said, he said, I'm trying to get you a promotion, which, uh, so I took to mean that the more she talked about this, the less likely her promotion would be? Is that what? Yeah. And that would be blatant retaliation, Your Honor. I mean, she shouldn't have to shut her mouth about violations in order to get promoted at the company. I mean, that would be direct evidence of retaliatory intent. And, and again, I don't think there's anything in the record evidence that. Here's my question. The refusal to promote, uh, happened in, was that in March? Um, 22nd at the Starbucks meeting, March 22nd, 2012. The refusal, um, is that when you dated from? Well, the, he says in May to her, um, I'm trying to get you promoted and you should stop raising. What's the date of that? That's May 14th, 2012. Okay. But the, um, oh. And in April he says to her, you know, on April 10th, 2001, that you should keep her mouth shut. So he says it twice to her. Um, and then in, um, the, she, she reiterates her and then on March 15th, the next day, she's not paid her bonus and she's not getting, she doesn't get a merit increase or performance review. Um, and then on March 22nd, she says don't return to work. The CEO says to her, and that's only a week following. Um, the two, um, arguably FCA related concerns took place on April 13th. That was the Doc in the Box program and the CME objection. That's correct, Your Honor. The, the Earl . . . First, the program. Um, if I understand it and the district judge does discuss this, your client called to say she was concerned that the FDA employee who was in attendance would see the event as a, you know, quote unquote, funny evening for medical faculty. And she asked to speak to a compliance officer. She was told that Mr. Temperato would speak to the officer himself. What Judge Coate was concerned about was that nothing asserted about that suggested that, um, the defendant's behavior was going to lead to a false claim being submitted to the government. How would that be inferred? Because what she was complaining about was what would be and what was well known to be a violation in this industry, which is to have the laptop with the face of the speaker off in the corner to provide cover for the payment of these gratuities. This was the thing that she was complaining about is the thing that the U.S. attorney ultimately pursued and led to the fine against the company. I mean, she doesn't have to say, and that, and that's the point of churches and the courts that the, the, the cases that have broadened the understanding of what constitutes protected conduct. She doesn't have to say this is going to be fraud or this is going to result. I understand that, but it does have to suggest that there's a problem with more than are we in compliance because they could hold this program as long as they didn't treat it as an educational one. And so the, the first step is let's check with compliance over whether we can denominate it an educational program to which the answer would have appropriately as all the dust settles be no. But where is there any evidence that once compliance was spoken to, they would have perpetrated a fraud on the government? But that, but that, but that Your Honor then goes down the road of really narrowing what, what can be protected conduct. Because if you're going to have I suggest every time anybody says, let's speak to compliance about something that's dubious, that if they don't get a promotion or they don't get some, that they've got an, this, this particular statutory violation. I don't think so, Your Honor, because there are only certain things that would be could form the fundamental basis of a FCA claim. There's not any compliance issue, but things about providing gratuities to doctors is a very sensitive issue in this industry. This is a kickback issue. This is, it's a violation of the anti-kickback statute. This is not just any compliance issue. The, the, the companies are, their, their attendance should be up and are always up about this stuff. Are we conforming to the anti-kickback statute? That's why they have the dock in the box. That's why they have the dock in the box program. Because they could just take them out to dinner. That's exactly, that's exactly right. So there, there are internal rules. These hospitals, the pharmaceutical companies have that have to be complied with. I mean, the anti-kickback statute is probably one of the principal bases or certainly an important one that the U.S. Attorney's offices across this country look at to determine whether there's a, a, a FCA potential action. So when one of your professionals comes to you and says, hey, we've got to go to compliance with this, you know, we have a potential problem with this, with the payment of gratuities here, that absolutely is, has to be protected conduct. When Judge Cote concludes that Ms. Dhaliwal was more concerned about her own liability rather than a fraud on the government, when she'd said there's an F, an FDA agent in the office and an FDA doctor, is it Judge Cote drawing inferences against Ms. Dhaliwal rather than in favor of her? Yes, I think exactly what she's doing, Your Honor. And I think that that, you see that throughout her decision, is that things that should be, and we're having a discussion now about protected conduct, well, we can have a fact finder look at all of the facts and all of the details of the back and forth in the discussions as to whether protected conduct would be one of the things that a jury would have to find. But we're talking now at the summary judgment phase of this. Certainly she's come forward with enough not to have a court interpose its judgment about these things and have a, have a jury decide whether there was protected conduct. What the timing of the... The court interposed its judgment about what was in Ms. Dhaliwal's mind when she said there's an FDA doctor here. Right. Okay, I agree. You've reserved one minute for rebuttal. Thank you, Your Honor. We'll hear from Salix. Thank you, Your Honor. David Zients for Defendant Salix. Salix. Your Honor, if I could begin with Doc in a Box and address the question of... You paid the fine over Doc in a Box, right? Your Honor, there was a settlement that related to issues that included that. Of course, Ms. Dhaliwal has admitted that at the time she was making these alleged complaints, she had no contact with the authorities and was not part of any NFC case. You didn't have to. No, certainly, Your Honor. I'm just, that's just his, uh, his contacts. Someone else filed, uh, the QITAM action before Ms. Dhaliwal? Yes, Your Honor. Someone at the company, at the same company? Your Honor, I'm, I don't, uh, I'm not sure I know who, who that was. I just know Ms. Dhaliwal in, in this record has, has admitted that she, as of February 2013, she had no contact, uh, with the government relating to, uh, to the QITAM issues. Okay. Um, I'd like to spend a little bit of time cleaning up the chronology because I think that's important if the court gets to causation, uh, but just briefly on the question of protected activity, uh, in this Doc in a Box program. Um, you know, at 780 and 81, uh, of the record, uh, on 780, Ms. Dhaliwal explains that she's attended, she, it's part of her job to regularly attend these events, uh, and there's no record of, of her ever complaining about them except in this one instance on 781, she says, it was incredibly concerning to me that an FDA official was present. Uh, and so I think to Judge Radji's point earlier, you know, and Judge Pooler, you mentioned the question is not just what Ms. Dhaliwal intended, but what a reasonable employer in that position would understand. Um, this is someone, Ms. Dhaliwal is saying, I panicked. There was, there was an FDA person here. What do I do about it? But her, her statement is, I want to talk to somebody in compliance and her, the person she's speaking to says, no, I'll talk to compliance. How else could that be construed than that there might be a legal problem here? And the legal problem would be with respect to the government. Help me out with why that isn't the way to look at this. We are first just looking at exactly what she said. It, she, I don't think she implied, you know, we have a problem with this program and it needs to stop. And she, what she's saying is I've been to a ton of these. I never complained before when the FDA wasn't there, but uh-oh, FDA is here. Uh, I better make sure that we stay out of trouble. But the FDA is here as in, they're going to know that we're giving these dinners or these social events. Right. And if he, she has to speak to compliance, doesn't that put her on notice that she thinks there may be a legality problem? Ron, I don't think it puts the employer on notice that she was objecting to it or trying to prevent it in illegality. If anything, she may have been, you know, perceiving an illegality and wanting to make sure it wasn't caught. Uh, but, but if, if you hold, I think even, even apart from that, if you look at the four, the first circuit's Booker decision, um, which was dealing with off-label promotion, which, you know, very similar, there was a settlement concerning off-label promotion, uh, and the, and the employee was then complaining about more off-label promotion. If this is a matter of law, it could not be construed as a complaint about a possible fraudulent characterization of this event, right? Correct, Your Honor. I think that no reasonable jury. You might succeed in, in your arguments if you go to trial, but my question is, don't you have to persuade us that no reasonable jury could think this was a complaint about, um, misrepresenting this kind of an event to the government? Well, Your Honor, I think it would have to be a little bit more than that. It, it, it would have to do with the fraudulent, you know, fraud in the government. This is a sort of, the, the FCA theory here is not that, that, that the government is being directly frauded through, by being at the event. It's this idea that, uh, that the doctors are being induced, uh, to, to fraudulently certify compliance with the anti-kickback statute, and there was just nothing. What could it mean when they, when she says, I want to talk to legal compliance? I think she says both of them. What could it mean except, I'm afraid we're committing a fraud on the government? Your Honor, I, I would read this as, as, as I, I want to help us not get caught, but, and, and, you know, to Judge Raggi's point earlier, you know, I, I don't think it could be the case that any time someone says, I wonder if we have a problem here, let's talk to compliance, that that is protected, and then that gives rise to a tribal issue. Well, it's fact-laden. It's a fact-laden, uh, discussion and analysis, but, um, uh, we're supposed to draw all inferences in favor of Ms. Dhaliwal when, on your summary judgment motion, and what inferences should we draw in her favor here? That she would, that she thought there was going to be a fraud on the government. Your Honor, I, I think, I think you certainly draw all reasonable inferences, uh, in Ms. Dhaliwal's favor. Uh, in our view, that's not a reasonable inference that a jury could draw, but, but, but if we assume for a moment, I don't want to, I don't want to spend all my time just, uh, on the dock and a box point without making, you know, an alternative argument, which is that, you know, let's assume that, that, that what happened on April 13th was the closest call, certainly as compared to things like complaining that a PowerPoint presentation doesn't set us up for success. So let's assume that, that the dock and a box, uh, complaint on April 13th, uh, was protected. The denial of the promotion, she alleges, was on March 22nd of that year. So beforehand. So that can't be causally related. That's at the, uh, meeting in... That's the Star, that's the Starbucks meeting, Your Honor. So that can't be causally related to dock and a box. On April 10th, you know, her, her whole claim of retaliatory animus is this, shut up, I'm trying to get you promoted. Um, Mr. Temperato allegedly said that to her on April 10th. Again, that is before dock and a box. So that can't be causally related. Um, this in, in May, uh, she met, so, so May is after, uh, and, and this is Mr. Atomoff who allegedly said something similar. Um, but you have Ms. Dollywell's own notes in the record about that. That's on page one 23 of the record. Um, she said she called Bobby, just sign it. I'm trying to get you promoted. Just sign it was referring to her performance evaluation. So on, so she was at, sorry, Your Honor. That's the one that was done in March, right? Exactly. So she was upset. She was upset and this is well established in the record. She's very upset about this performance review, uh, because, uh, because her supervisor said she could make points that were belabored. Uh, she didn't want to sign it, uh, acknowledging receipt of the review. Uh, so what she says in her own notes in May when, when Mr. Atomoff says, I'm trying to get you promoted, she says, just sign it talking about the performance review. In fact, this whole document I think is an important one. It's at 119 to 126. Those are Ms. Dollywell's own notes preparing for this meeting with the CEO, sort of detailing her mistreatment by the company. Uh, you know, putting in her own words, everything. It doesn't mention doc in a box once. It mentioned some of the other things she complained about, uh, like the Celesta slide deck. It just doesn't mention doc in a box. So, so if we were to assume that this doc in a box complaint was protected conduct, what we have is that happened in April. She continued being a valued employee through the rest of the year. She went on medical leave. Uh, she then decided she didn't want to come back. They were negotiating a severance. Even if you treat somehow, uh, you know, the, this conversation about, uh, we agree, let's work out a severance is, is a termination or a constructive termination. That's now 11 months out of this, out of this doc in a box complaint. And that's all she has. And I don't think this court has accepted something like that, uh, as giving rise to a causal reference, uh, excuse me, a causal inference. Um, and Your Honor, if you, if you look even at the, at Ms. Dollywell's brief, you know, when she, when she argues causation, it really depends not, uh, on, you know, just getting past summary judgment on a single, uh, aspect of protected conduct. You know, her case of a causal inference is, is this close temporal connection where she says I did something protected. It was immediately retaliated, did something protected, immediately retaliated. Uh, and that really falls apart if all she has, uh, is doc in a box. Uh, on top of that one further causation point, um, when you look at the document that I mentioned where she was, you know, cataloging her list of grievances, uh, and again, in, in letters that her lawyer sent, she says for two and a half years, my life has been a nightmare. You know, it all dates back to when my supervisor Philippe Adams joined the company and she describes in her words, a pattern of retaliation, uh, and harassment. And this is before doc in a box. This is before everything. She says she admits that she didn't, nothing she even characterizes now as protected didn't happen. The earliest thing happened in, in March, April of 2012. She says from the middle, uh, to end of 2010 when Philippe Adams joined, she was subjected to this campaign and pattern of harassment. Um, and this court slattery decision, which we quote in our brief, uh, says, you know, if it's, if, if you were talking about sort of a gradual accumulation of adverse actions, but that accumulation begins well before the protected activity, um, then at summary judgment, there's just no inference that can be drawn, uh, uh, of causation, uh, that the one that the protected activity was the cause of the adverse action. So in our view, you know, even if, even if you accept the doc in a box complaint as protected activity, which of course we, we, we don't agree with, but, but, but even, uh, relate certainly relating to 2008, I really, I just mean we don't agree with, uh, with characterizing her comments on it as protected, but, but even then, um, I think if that's all she has and in our view, that's the most that she has there, there's just no way, uh, uh, for, for this causal case to get past summary judgment. Uh, just one final point to, to clean up an issue that your honor, uh, judge Pooler, you mentioned about, uh, whether she was out on sick leave when certain things happened. Uh, so the alleged, uh, lack of pay, uh, didn't get a raise, didn't get the full bonus. You know, the undisputed evidence in the record is that, is that this is while she was on leave. Salix has a policy of not, uh, of not giving raises, of not paying full bonuses for time, uh, on leave. You know, the, the, the, this test is, you know, that's a legitimate, that's a legitimate explanation. And it is at that point on the plaintiff, you know, to explain why that's pretext. And we just have heard absolutely nothing for why that was somehow pretextual. Thank you. Thank you, your honors. Very quickly on the question. Mr. Kaiser, you need to answer for the, uh, the, the, the timeline. Okay. Well, sure. Did he claim retaliation from the March 22nd, uh, meeting in Starbucks? And if so, that was before the dock in the box. I'll, I'll, I'll answer that your honor. But I, to, to answer that very directly on the dock in the box, I, cause there's all sorts of complaints and retaliations, but this makes it very clear. I believe on March 13th, she complained for the first time about the dock in the box program, among the other things. March 13th. March 14th, 2013 to the CEO of the company and to the CFO. March 14th, so she was on medical leave, but she wasn't fired. She was on medical leave. She has a meeting with the CEO, Carolyn Logan, the CFO, Adam Derbyshire, where she complains about the dock in the box program and the other things. She hadn't included them in the complaints previous. And on March 15th, she's not paid her bonus the next day. Not provided a merit increase or performance review for 2012. Sorry, just to keep on the timeline, could you remind me of what triggered the complaint in March? Because the dinner wasn't until April, 2012, right? Right. So, so, so the, so the, so the dinner, when she first makes the dock in the box program, it is on April 13th, 2012, where she's told, and then on May 14th, 2012, she has another discussion about it, where he says, I'm trying to get you promoted, keep, keep your mouth shut or whatever. I'm asking you for the March 14th, I, I need to put the March 14th date. That's the next year, Your Honor. Oh, the next year. Fine, fine. Go ahead. So, so on March 14th, 2013, she, she meets with the CEO and the CEO meets these complaints, including dock in the box. She hadn't, she hadn't previously spoken to the, the CEO about those things. And then on March 15th, the next day, she's not paid her bonus, she's not provided a merit increase, she doesn't get a, a performance review. And then on March 22nd, 2013. Do you agree that that is company policy for people who are out? No, no, I don't agree with that, Your Honor. Not to be paid a bonus or get a merit increase. No, I, that's not something that, that she absolutely contests that that's true. And then on March 22nd. Is there a discovery on that? It's her, there's her, she was an employee there and there's her testimony on it. On March 22nd, 2013, she should not return to work. I mean, that's the week later that Logan is telling her not to return to work, which is a week following her meet, her meeting with CEO saying, talking about the dock in the box program. So on March 22nd, Logan says, you should not return to later than the initial, uh, let's talk to legal compliance. Right. But it's the, it's, it's within days of her complaint to the CEO. And I would just add one thing. We believe that the, her complaints about the marketing material, because her complaints began in the beginning of February, 2012, with her complaints about the marketing material and the fraud that she believed that these were, there were fraudulent omissions and so forth. We believe that's protected conduct as well. And, and that was prior to her not getting a promotion. So there was an accumulation of objections she was making. It didn't begin with the dock in the box complaint on April 13th. Preceding that were the complaints about the marketing material that she claimed were, were, were, were fraudulently incomplete and had expressed misrepresentation in them as well. And we believe all of that is protected conduct and all of it is subject to having a jury decide whether it's protected conduct. So there, there's an interplay of, of retaliation and complaints that occurred to take the April 13th dock in the box complaint and then match it up to things is, is not how this record should read. And it's certainly not how a jury should be allowed to evaluate all of the complaints and all of the retaliation to determine there was a fraudulent, there was retaliatory intent, particularly when a supervisor says, keep your mouth shut on two occasions about this stuff. I'm trying to get you, I'm trying to get you promoted. And particularly when the, the CEO is expressly told about it in March of the next year and then within days the, the, is followed by, and then within a week of saying, don't come back here. All of that, that whole mosaic of conduct, you know, presents itself to a fact finder to decide whether she would in fact was retaliated against. Thank you. Thank you both. Lively discussion. We'll reserve decision.